Next matter is U.S. v. Bailey et al. And there's so many issues here. We'll go ahead and put your name on the record and then we'll begin with this. Yes, may it please the Court. My name is William Spade. I represent the defendant, Lamar Macon, or the appellant in this case, Lamar Macon. And I would like to reserve two minutes of rebuttal time, please. We've split up among the four appellants. We've split it up as six for me and then three for each of my co-counsels. So I would like to take two of my six. Okay. I wanted to address the 404B issue with that. I don't think it goes to Mr. Macon, does it? No, it does, Your Honor. Okay. It doesn't go to everybody. Mr. Macon raised it. Mr. Macon raised it in a pretrial motion. He raised it during trial at two separate points. And I also filed a letter with the court seeking. What happened here, Your Honor, is that Mr. Davis filed his brief first and extensively briefed the what I'll call the Tyquin James murder claim. So I chose to simply join in that, join in Appellant Davis's argument. Okay. Your Honor, in this case, my client, Mr. Macon, was charged. The two main charges were conspiracy to possess with intent to deliver a controlled substance and then the 924C. There were some tangential telecommunications and furtherance of a conspiracy charges. It was a very long conspiracy period from October of 2010 until March of 2013. What's relevant here is that even by the government's concession, my client was the most minimal of the minimal of the participants in the alleged conspiracy here. Let's talk about the Tyquin James murder evidence and the video. That's the pitch that you folks have made that seems like the other side maybe thinks has the most weight. And I want to ask you, do you agree that we could look at those things separately, that is evidence about the murder separate from the video, that the video prompts or raises a different issue unto itself? Yeah, absolutely. I think the admission of both of those pieces of evidence were problematic, but the video was the coup de grace. Okay. Yeah. So to speak. Now, focusing very specifically on the non-video piece of it. Yeah. Right? Pieces. Yes. That set the non-video set of evidence about that murder. The argument has been made that that was cumulative evidence in some fashion, and I'm trying to understand how that can be the case that it's cumulative when, well, it indicates, does it not, that firearm usage was a reasonable foreseeability within the dairy organization? Your Honor, I would contend that it does not because it is a murder with a firearm. How does it not show that? It is a murder with a firearm. It comes at the very end of the conspiracy period. So the conspiracy is approximately two and a half years. The government put in a lot of evidence, I think, based on page 84. Does that go to admissibility or the probative value? It goes to the jury's opinion issue. It goes to the probative value of it. Absolutely. But the government's argument here is that they presented this piece of evidence, and pieces because we'll call it the non-video Ty Quinn James murder evidence, was an entire morning. The entire morning of December 2nd, 2014, for more than three hours, they put on multiple e-mails between the two dairy brothers, their girlfriends, other co-conspirators. They put on text messages all talking about that murder. And in one of the text messages, the girlfriend says to Mr. McCall Dairy, not Malik, the person who actually killed Mr. James, headshot, first homicide of the year. So the jury heard from the other co-conspirators' own mouths that a gun was discharged during the conspiracy. Right. So my question to you stands. How is the evidence that there was, in fact, a weapon used in a shooting, in a murder, cumulative, when the assertion that's being made under the 924 count is that for Pinkerton liability, it was foreseeable that guns were going to be used? The answer to that, Your Honor, is during the course of this approximately 10 to 11-week trial, the Commonwealth put on evidence of many discharges of firearms. Indeed. Thank you. The very point I'm attempting to ask you about, does not each additional shooting indicate this was foreseeable? Every shooting is not cumulative of a last shooting. It's an additional point that shows this was foreseeable because it's happening all the time. Your Honor, I think you have to put the cumulative in the context of the 403 analysis, which is 403 says if it's probative, then you, and yes, is it probative? Yes, it's a firearm that was discharged during the course of this alleged conspiracy. So is it probative? But then the other step is, is it being needlessly admitted if it's overly or unduly? What do you do with Old Chief then? You're basically saying they didn't need it and Old Chief said that's not the test. Well, I think what Old Chief says is the government is allowed to put on their best evidence of the particular whatever point they're trying to prove. What we have here, Your Honor, especially with regard to the video not being necessary, is that you had three hours, you had absolutely three hours of testimony of playing recordings in which it was established ad nauseum that Mr. Malik Derry shot and killed Ty Quinn James. Some of the evidence coming from his own mouth. So with regard to, and then when they went to play the video, the four defendants all agreed that we would stipulate. We said it was absurd. You do have Old Chief. I think the stipulation part, you do have Old Chief. The issue is whether or not the video vies 404B, I think. No, the issue is, I think it's square line. It's 403. It says 403, Your Honor. It's square line or 403. But the issue is, under Old Chief, they did get to put on. They did get to put on good evidence. They got to put on evidence from the Derry's own mouth that they shot and killed. So the video was, the video truly was. We've slipped into the video now. I'm sorry. We were leaving the video to the side, right? Video to the side. But you've answered my question. Thanks. Well, just succinctly, it's cumulative because if you fold it into the 403 analysis, there was so much evidence there that the government contended showed that, as Your Honor said, the government's contention was the shootings happened over and over and over again. So that by the time that you got to this really, really prejudicial shooting, this murder, at the end of the conspiracy, that's where you go into it was needlessly admitted because they already had all this other foreseeability evidence. Thank you. And with regard. Well, you say sometime, I think, right? Oh, I'm sorry.  Okay. Thank you, Your Honor. Good morning, Your Honors. Good morning. My name is Gina Capuano, and I represent appellant Terry Davis. This evidence of the Ty Quinn James murder, first just the evidence of it without addressing the video, I agree with Mr. Spade that it was cumulative. They put on in this trial numerous incidents regarding firearms, possession of firearms, discharging of the firearms. As a logical matter, I'm still not getting you entirely, despite Mr. Spade's best efforts in that regard. If the point under Pinkerton is you've got to show that the acts of your co-conspirators were something you could reasonably foresee, how can it be cumulative to show that this happened repeatedly, not just once or twice or three times? Doesn't every single shooting add a piece of independently significant evidence as to the foreseeability of the use of gun violence in connection with the business of this criminal organization? If the shootings are connected to the gun violence, yes. Okay. However. Well, then that's something for you to have argued in the trial, that, oh, somehow that was a shooting that was unrelated, or it didn't have to do with the conspiracy, or, you know, that it was not in furtherance of the ends of the conspiracy. But to say that's a different argument than to say it's cumulative because holy smokes, how many shootings do we have to hear about? That's the argument you seem to be making now. And my question to you is, since Pinkerton is directly in play and reasonable foreseeability is the issue, doesn't every shooting have independent significance? Yes. Okay. Yes, I do agree with that, Your Honor. In this case, however, there was no evidence presented by the government. There was an enormous amount of evidence, as you can see from the record, that the Derry brothers committed this murder, that Malik Derry actually committed the actual murder and Mikhail Derry arranged it and helped him facilitate it, based on the text and all the evidence that was presented. The problem in this case is this alleged conspiracy that – and I concede that they've proven a conspiracy. The drug conspiracy that they've proven, I conceded from the beginning that there was a drug conspiracy. I argued whether or not they proved my client was part of it, which was my sufficiency claim, because although Mr. Spade made the argument he thinks his client was the least culpable, I had that argument as well because – Remarkably, everybody thinks so. Right. And my basis was the amount of telephone calls that were recorded. When I figured out the percentage that they heard my client on the phone, it was 0.02% out of the recordings. And that was my main issue regarding – Depending on what we're saying, that 0.02%. Yes. Even a smaller number of recordings could be all they need. Yes, it could have been, if the content of those calls would have been enough to show that he was a member of this conspiracy. And also if the calls were really the only issue, but it's not the only issue, right? You've got Kareem Young and you've got Agent Cop, and they both sink your client's boat in the sense of saying he's in it deep, right? He carried guns. I mean, there's no argument regarding that. He lived in the area he hung in the Stanley Helms projects where this whole drug conspiracy operated. But doesn't Young go beyond that and say he wasn't just an enforcer, he was a dealer? Kareem Young says that. Yes, he does. I agree. As far as the sufficiency evidence goes, that was all that they had that would show that he was a dealer or that he was an enforcer. He came up and said, yes, Terry Davis is an enforcer for this gang. However, I presented in my closing argument, I did a slide of every act of violence, every shooting that took place in the course of this conspiracy. I think there was 11 or 12 acts of violence, and Terry Davis didn't have any of them. So that was my argument as far as being an enforcer. But they accepted Young's testimony. That he was an enforcer, yes. The fact that he wasn't in any of those 11 acts of violence doesn't really help you, given Young's testimony and if they accepted it, which they apparently did. And if we could go back just to the video just briefly, the video of the Ty Quinn's James murder, we all objected to that. Because you could actually see the shooting. You could see Malik Terry shoot Ty Quinn James. And we agreed to stipulate to the fact that he was shot in the head and he was killed, and we already heard other evidence of it. Now, that takes us right to the old chief point, right? Yes. That the chief judge was asking about. Go ahead and address that. You have old chief, which says the government doesn't have to accept an offer of a stipulation. It can put on the evidence it wants to make a point and thinks it needs to make, broadly speaking. Yes. What's your pushback on that? The pushback is when we addressed the trial court regarding this, we argued that the showing of this video was unduly prejudicial. That the only reason that they were showing this video was to arouse the emotions of the jury. They already had other evidence of the shooting. There was evidence in regards to their text messages, their recorded conversations of the juries regarding the shooting. Everyone knew that Ty Quinn James was shot and killed. There was no need to play the video. And we argued that the probative value of the video outweighed the prejudicial effect. And we argued that's a pushback. It's 403. Yes. It goes to 403. Which hits around the old chief issue. Yes. It's completely a 403 argument because as we placed on the record, after the government was done putting on their case, when they played that video there was a gasp from at least one of the jurors. And we put that on the record. And that just supported our position that the reason that that video was being played was to draw some kind of emotional response from the jury. It was unnecessary given all the other evidence that they presented. And I think it was an error to allow that in. And the judge even makes a comment. Now assume that's error. Yes. Is it error that so infects this weeks and weeks and weeks long trial that all the other evidence is overridden and the verdict should be overturned? I would say so. That video was extremely prejudicial. If you want a jury to consider the evidence. Now let's talk for just a second about that. Because you've included it in the record. I watched it. It is a terrible thing to realize. It's a security camera video. There's no sound. Black and white. A little bit grainy. You do see the guy will come up behind. You see the shooting. You see him drop. And that's all you see. I wouldn't want the record here to imply that this was like a Hollywood special effect, head blown off kind of a thing. It's a terrible thing to see. But it's not some really graphic gruesome thing in the way, you know, some people might think when you saw, oh, he comes up and shoots him in the head. Would you agree with that, the way I'm describing it? I would agree, yes. Okay. So it is a shocking thing to see for sure that you realize somebody, that's not pretend. That's not TV or movies. That's a real person losing their life right there on that screen. I mean, I more than grant you that. But is that, that somewhat grainy security cam video really so prejudicial that it calls into question the verdict in the face of what everybody agrees is a lot of testimony. In fact, the argument here is cumulative testimony, so much testimony that it's over-the-top testimony. How do you get around a harmless error argument? I would tie that into the sufficiency argument that I made for Terry Davis. The evidence against him was minimal at best, and that is what I argued to the jury. When you say minimal, it sounds like you're defining minimal in terms of the number of witnesses against him or the pieces, the volume of evidence, not volume, but the number of specific instances of testimony that links him via witnesses. But you've got a long string of testimony from Corrine Young that ties him in. If you take Corrine Young out of the case, you may be right. But with Young in the case, how can you still make the same argument? Because Young's testimony at trial differed from his prior statements. And if we didn't have this video. I think it's a credibility issue. It's a jury issue. They bought it. Right. But my theory is if they wouldn't have seen that video and wouldn't have been as unduly prejudiced, that they may have second-guessed what Corrine Young was saying. Because originally when he gave his first two statements to the government, he said that he didn't really know my client and he didn't have anything to do with it. And it was only subsequently in one of his third or fourth statements that he started to say, yes, Mace, which was my client's nickname, yes, Mace used to get drugs. He used to sell them too. However, all those controlled buys, all those videoed buys, the trips to the range where people used to go up and practice shooting, my client wasn't involved in any of those. And I think but for the video, the result in this case may have been different. Thank you. Thank you. May it please the Court, James R. Murphy on behalf of the appellate Dominique Venable. My client, Mr. Venable, spent most of the time during the two and a half years of this conspiracy in various state and county jails, approximately in Atlantic City for 21 weeks. And the issues have already been stated with regard to the Ty Quinn James murder. Obviously I agree with the other issue that I had raised with regard to my brief was the testimony of a Atlantic City detective who was cautioned previously that there would be no testimony as to some evidence found at a shooting scene at 436, I'm sorry, in what they call the back Maryland section of Atlantic City. And that particular detective had been allegedly advised by the prosecutor's office, by the U.S. attorney not to testify to it. And the first thing out of his mouth was a reference to the head stamp on the cartridge, 22 cartridge that was recovered. And then it was cut off. And the jury didn't even get a whiff of that. I mean if you read that transcript, exactly. There was like a syllable uttered and stopped, right? That's when I, well there was an objection made by me and there was an utterance by the special assistant U.S. attorney. And kudos to you for being right on top of it because you did stop it like that. And the prosecutor didn't talk with it. The prosecutor backed off immediately. The downside to stopping it just like that is what do you have for appeal? You did stop it. Well, your honors, this was not also the first instance of, again, police testimony in the trial going into areas that they were advised not to. They had Detective Halton with regard to Rosario. And you have this. Are you arguing that there was some pattern of practice? Because in looking at this, you have identified only two that I knew of. The Rosario one, the government had an excuse for it. They said I didn't have a chance to get there. The prosecutors said I didn't have a chance to give them beforehand. And on this one, it was not something that was asked for and it was stopped immediately. Do you have some other thing in here? Because if there's an argument here of prosecutorial misconduct and getting people to file it, I didn't pick that up. My position is that the mistrial should have been granted with regard to both Rosario as well as my client because we had, I think, 60 witnesses in this case. And each of them allegedly, most of them, with the exception of Kareem Young, were all police-related, chemists, that kind of thing. So, I mean, if the government cannot control their witnesses, it should not go to the detriment of my client. Well, when you say they can't control their witnesses, you've just noted 60 witnesses and you've been able to identify two instances where something may have gone off the rail. You're clearly a man who's been nose-a-ways around the courtroom. You handled this case as you pointed out. You were on top of this thing. I mean, if you can only point to two instances out of all that, in your experience, would you say that's a pretty clean trial or not? When you add up the Ty Quinn James matter, it's not a pretty clean trial, but absent the Ty Quinn James matter, it probably is, Your Honor. Okay. Thanks. Thank you. Thank you, Your Honor. Good morning. May it please the Court, John Holliday representing Kareem Bailey. With respect to the record as a whole, as it pertains to Kareem Bailey, in literally every incident of evidence that was presented by the government with respect to the 11 violent acts and shootings, a comparison between Kareem Bailey and the arrests and searches of every other associate of the McHale Dairy Organization, with respect to every incident involving trips to the shooting range, the Tropicana, pulling money to buy quantity supplies of heroin at lower cost, there was absolutely no evidence at all that any of this pertained to Kareem Bailey. And as this relates to my argument with respect to the appeal of the lower court's decision denying our 29C motion, at the heart of it with respect to Kareem Bailey is the issue whether or not there was sufficient evidence to sustain a conviction for the conspiracy. Did you talk about Bailey? I'm sorry? Did you put Bailey into the conspiracy? Yes, Your Honor. Your Honor, the government presented two cooperating witnesses. Kareem Young was the only one of the two that implicated Kareem Bailey, and he testified he was subject to extensive cross-examination. The question is whether or not his testimony in and of itself was sufficient. Speaking only for myself, you might have more fertile ground to plow with the evidence of your client's prior conviction in 404B than getting into sufficiency. It seems to me the sufficiency is strictly a credibility issue. If the jury bought what Kareem Young was selling and they fully did, there's more than enough evidence to convict your client. The more complicated part is the evidence of the other bad acts that came in against your client. You can argue well. Absent that, they wouldn't have accepted Young's testimony or Bailey's, the same argument Ms. Caputo made about her client. But maybe you should focus on the 404B evidence of the past conviction. Your Honor, my client was a juvenile at the time he was arrested on September 4th of 2010, one month prior to the charged conspiracy date, which began in October of 2010. While a juvenile, he was arrested in the Stanley Homes area. At the time of his arrest, he was found in possession of a handgun and a body of cocaine. We're familiar with the facts. You made the argument that this was unduly prejudicial, and in fact that it was not good under 404B even before you get to 403. The district court ruled that it was both intrinsic and, at the government's urging, that it was proper 404B evidence. So I put it to you. Is it intrinsic evidence? That's the first step. Was the district court right or wrong to call it intrinsic evidence? Your Honor, I would argue that it was not intrinsic evidence. It actually predates the start of the conspiracy. But forget that for a second and just get to it. Because the court explained that and says, I don't know about it. So don't worry so much. There are some cases that substantiate that. So don't worry so much about whether or not it predated because then the court would be extrinsic. It involved cocaine. There were no other people involved in that incident that were ever subsequently related or involved in the dairy organization. It was a very isolated incident that pertained only to my client. It involved cocaine and not heroin. And even after that, my client was arrested in November of 2012 during the period of the charge conspiracy. That was a cocaine arrest. There were two controlled buys that occurred during the time of the charge conspiracy involving my client. That also pertained to cocaine. So the circumstances surrounding that September 4, 2010 arrest and my client's connection with cocaine, even Kareem Young, the cooperating witness, admitted during his testimony that during the first two or three proffers that he had with the government, the information he was providing was that my client was a cocaine dealer. Okay, let's assume then for the sake of further discussion that it's not intrinsic. And we're looking at 404B. The argument, the pitch that's made by your opposing colleague here is that we've got Pinkerton liability in play for the use of the gun violence and that your own client's use of guns in connection with drug dealing shows a knowledge, certainly shows it was reasonably foreseeable to your client that guns and gun violence would be used in connection with this conspiracy's drug dealing. Why is that wrong? Because, Your Honor, I don't think that there is a sufficient connection in the evidence. He's using guns in connection with cocaine dealing a month before the start of the conspiracy. But that doesn't go to his knowledge and appreciation of guns in connection with drug dealing in your mind? Your Honor, it does. And certainly that's, you know, he was in, I mean, he had the gun at the time of his arrest when he had cocaine. But in the totality of the evidence that was adduced at the time of trial, it's also equally important to consider that the vast amount of evidence that was presented through these 11 separate independent acts of crimes of violence and gun violence, that there was absolutely no connection with Kareem Bailey. So I understand in a very general sense the connection between drugs and guns, but with respect to the charge in this conspiracy, which was a charge to distribute a kilogram or more of heroin, in consideration of the nature of that charge and all of the subsequent gun violence that was adduced during the period of the charge conspiracy, I think that it's very noteworthy that the fact that none of that evidence in any way, and this was undisputed at trial, had any connection at all with Kareem Bailey. Did you say anything about the conspiracy that the jurors, the docs, Malik and his brother, that they were dealing not just heroin but also cocaine? Your Honor, I don't recall Kareem Young's testimony indicating that the Derry brothers or that the Derry organization was dealing in cocaine. I recall that Kareem Young testified that he initially identified my client during the first two or three proffers he had with the government as being a cocaine dealer, and it was not until subsequent proffer meetings that he provided additional information relating my client to the distribution of heroin. But I don't recall any evidence from him as a witness that the Derry organization was involved in the distribution of cocaine. Thank you very much. Thank you. Good morning. Good morning. May it please the Court. My name is Norman Gross, and I represent the United States. Mr. Gross, you're not just observing today? I'm not just observing today. You're actually out in the field today. You know, you brush off the bench. Judge McKinney, this is the first time the Court has asked me for argument in about two years. I thought that you lost interest in me, so I'm glad to be here today. Well, you obviously, as much as you've been around, despite your absence for two years, you understand the concerns, and maybe you can help us out with that. Why in the world was that video infused? You talk about gilding the lily, and you're just fertilizing the lily, gilding the lily, plucking the lily, sticking it in a bouquet, and sending it out with an edible arrangement. Why in the world would they? I looked at that thing this morning. Why in the world would that thing come into evidence? Your Honor, it came into evidence because it had additional evidentiary detail and depth that I'm going to describe for the Court in a minute that was absent from any of the other evidence that we presented that went both to the identity of the shooter, which was not stipulated to by the defendants. None of these four defendants were those shooters? That's right. The jury was absolutely aware of that, and when we get around to talking about prejudicial effect. Are you saying, is your argument really going to be that you needed the jury to see this guy shot and see the video because the Schwinn bike would tell you it was Malik's brother and otherwise no one would know what was going on here? That's a mighty thin reed. I didn't know it was a Schwinn. But that's not the only reason why it was admitted, Your Honor. That is one of the reasons why it was admitted. Didn't the defendants say they would stipulate? They said they would stipulate that Mr. James had been shot, but they did not stipulate that this was a murder that was committed in furtherance of this drug trafficking conspiracy. And the Schwinn bike was going to make that point? The video absolutely supported that point. How does the fact that you see the guy, get it in the head and drop like a rock, tell you it's this conspiracy? Well, it's this conspiracy because there's other evidence that shows that it's this conspiracy. Precisely. But it shows, Your Honor, I'm sorry. Go ahead. It shows that this was the kind of murder that would have been committed in furtherance of the conspiracy precisely the way that Kareem Young, the government's crucial cooperator, testified, and his testimony was challenged at every turn. His testimony was that this organization used violence, and not just shooting into apartments or so on, but they used deadly violence for two reasons. Well, you're making arguments that are perhaps persuasive about needing to show there was a murder, but that does not answer the question that's being put to you. Why did you need the video? What did the video get you, except for the emotional wallop of seeing a guy go down with a bullet going through his head? What the video got, Your Honor, is it showed how the murder was committed in a way that no other evidence did. It showed that it was committed brazenly when other people were standing around in a public area. You can see in the video that there were bystanders there. Malik Derry rides up and brazenly guns him down. That's number one, and I'll tie that into why it shows that it's in furtherance in a moment. It shows how casually it was done. Malik Derry rides up. There's no confrontation. It's clearly premeditated. He shoots him, and then nonchalantly rides off. And finally, it shows the efficiency with which this murder was carried out. There was a conversation afterwards in which Kim Spellman, Mikhail Derry's girlfriend, says, first homicide of the year, headshot. And that video showed that, that Malik Derry was capable of riding up on a bicycle. All this seems to be, your argument seems to be saying it was important for the jury to get the emotional impact of this murder, because everything you've just said could have been dealt with if you thought every point. In fact, given the, and I've read the transcript as primarily it's between Mr. Spade and Mr. Askin, but Ms. Capilano was in the discussion too at some point trying to say, don't let this in, and we'll stipulate. And your colleague, Mr. Askin, he's just having none of it. He wants it on, he wants the jury to see it. What is it about seeing it that's important? Your Honor, it shows that this organization is using deadly violence in order to keep out competitors from their drug trafficking area. I apologize, I'm not making myself clear. Let me try it again. What is it about seeing it that you get that you wouldn't have gotten with a stipulation? They were prepared to say, it looks like, yeah, one of the Derry brothers rode up, shot him right in the back of the head, right there in front of everybody. They were not willing to stipulate to that. Where is that in the record? Because in the record, when I read it, it looks like they're ready to say, hey, don't bring this in. We're ready to talk. Do something different. And the judge even says, well, why don't you let it in so you have an issue on appeal? Why don't you let it in so you have an issue on appeal? And Mr. Spade says, I don't want an issue on appeal. I don't want this in. But apparently, for some reason, the government did want an issue on appeal. So now you've got it, and you've got to defend it. Judge Jordan, the defendants were not willing to stipulate that this was a murder that was committed in furtherance of the conspiracy. The stipulation that they offered at the last minute, and remember that there was extensive litigation about this. I'm not saying that they were prepared to admit it was in furtherance of the conspiracy. But that's the key point, Your Honor. Seeing the guy get shot shows that it's in furtherance of the conspiracy? Yes, it does. How? The manner in which it was undertaken, the brazenness, the efficiency. That doesn't show it was in furtherance of this conspiracy. You've got a 30-second video that shows in a way that no other evidence could show how this murder was. How to shoot somebody. Your Honor, how to shoot someone in public in a way to send a message to competitors and to people within the organization that they better not withdraw or stray. Because. How does it tie to this conspiracy? If your only issue was you had to see this video to know it was part of the conspiracy, you've got to draw that logical line for me, Mr. Gross, because I'm not seeing it. How does the video show it's in furtherance of this conspiracy? Because that's what you're hanging your hat on now. No, Your Honor, I don't have to show that the video does all of that work. All I have to show is the video does some of that work. I don't have to show that without the video we couldn't have shown that the murder was in furtherance of the conspiracy. That's simply not the test, and that's what you're suggesting is the test. No, I'm not suggesting that. I'm trying to follow your argument. Your argument to us is, the argument you're making to us is, they were ready to stipulate, but not that this was in furtherance of the conspiracy. Okay, if that's the one piece that they weren't willing to go to, and that's what you needed this video for, then you better justify, you ought to be ready to justify, how the video shows that it's in furtherance of this conspiracy. Because if it doesn't do that, then what happens to your argument? What do you got? Your Honor, I'm sorry I'm not making myself clear, but a drive-by execution style shooting, which this was, and this video clearly shows, shows that more than any other piece of evidence, that this organization used homicide as a manner of doing business. And this was a very business-like execution, and you don't get that from any other evidence that was put in in this case. And you certainly don't get it, you certainly don't get it from the conversations or the testimony of your vision. You don't, you don't, you just cited us one, the girlfriend saying, first homicide of the year, head shot. That doesn't do it? No, because you don't know, because you don't get the emotional wallop, right? You wanted the emotional wallop, that was the purpose, that was why it was going in, and that's right smack in the middle of 403 land, isn't it? A couple of responses. First of all, the judge gave an instruction, precisely as to the video, in his final charge, that the jury could not consider the emotional impact of the video. That's like saying, don't imagine a red bull right now. Well, Your Honor, I've been in this courtroom, I've been visualizing a red bull. We presume that the jury follows the instructions. But that's a little like, you know, there's that famous New Yorker cartoon where the jury's faces are all aghast and the judge is saying, disregard that last comment. I mean, here you've got, you actually have on the record, the defense counsel putting on the record, I want the record to reflect that there was an audible gasp from the jury box. Mr. Spade says that. Ms. Capuano, I heard it as well. The court, I didn't hear it. I'm happy to have it put on the record, Ms. Capuano. I heard it as well, Mr. Holliday. I did hear it, Your Honor. Mr. Murphy, I also heard it. Funny, defense counsel had a terrific hearing. I'm not questioning that, says the court. Mr. Askin, did you hear it, asks Mr. Spade. I believe I did hear it, but I don't know if it was from one juror. I don't think it was from 10 or 12 jurors, but I did hear something. So the court says, it's on the record. You wanted the emotional impact. Evidently you got it. At least one juror is horrified enough to go, as they see somebody getting shot. Your Honor, first of all, I take exception to the, and perhaps you're not doing this, we are not trying to prejudice the jury. We're trying to prove the fact that this was a murder that was in furtherance of the conspiracy, which makes it reasonably foreseeable to all these defendants who say. Nobody is suggesting to you that there were nefarious motives here, Mr. Gross. If my questions to you are implying that, I apologize. I'm not attributing ill motive to the government. Thank you, Your Honor. What I am trying to get at is, it appears that the government wanted to have this evidence because it was high emotional impact evidence. And you and yourself in this argument have said, nothing shows quite like the video does, how brazen, how outrageous this was. So there was this aspect of, we want emotional impact. So let's just take it for the sake of argument, for discussion, that maybe we think this was an overreach by the government, and that you've got a 403 problem here. Assume for the sake of discussion that we think it's error for the court to have let this in. You seem to say in your briefing that we should be viewing this under a plain error standard. Did I misunderstand that? Yeah, I think so, Your Honor. Okay. There are several aspects to their 403 claim. And one of them is that Judge Irenas didn't do sufficient on-the-record balancing. Right. And that is a, they certainly raised the 403 objection to the video. But after, and there were two occasions when the judge addressed the Taekwon James murder evidence. He addressed it at length before any of the evidence came in for approximately 20 pages. And then he addressed it several days later before the video was played. But did he address, did he address, did he do a 403 balancing about the video? Because the 403 balancing about the video seems to be his comment at the time saying, I don't think it's a problem under 403, it's in. And that seemed to be it. No, he said, Your Honor, he said, I've looked at the video and it doesn't, it's not graphic. And I think we had a concession here during argument today that it's not a graphic video, which mitigates the prejudice. And Your Honor, the prejudice is mitigating. Hold on just a second. Right now we're asking the question not about whether it is graphic or not, but we're asking about, as you've rightly done, Mr. Gross, you've rightly pointed us to the piece of this where we're asking, did the judge adequately on the record explain his 403 analysis? So leaving aside what the video does or doesn't show, the question being, did the judge do a sufficient explanatory job? Other than when the judge says it in the hearing, focused on the video, is there another place where he addresses the video itself? No, that's the only place where he, well, let me think back for a second. I have a longer conversation about this. He talks about whether it's extrinsic or intrinsic, and there's a long exchange between him and counsel there, and that's where he says, well, I should let it in so we have an issue on appeal. But then he doesn't say, that I can say, anything that is consistent with what we require about 403 balancing on the record. But, Judge, that's where the defendant's had an obligation to stand up and say, Judge, you haven't done adequate 403 balancing, and that's why I say it's plain error with respect to that portion of the argument. A defendant objects to something under 403. The judge lets it in. Have you ever said, well, after you've objected and the judge lets it in, you've got to stand up and make a specific 403 balancing objection? Yes, absolutely, Your Honor. Where have you said that? This Court has never said that the normal rules of issue preservation do not apply to the requirements of preservation balancing. They made a 403 objection. They made a 403 objection. They got a ruling. Is your position that defense counsel are supposed to say, hey, you didn't do a good enough job? Do it again. Yes, Your Honor. Go back and do it again. For precisely the same reason that this Court on Bonk held in Flores Mejia, that it's not enough to just tell the judge that he's got to consider these factors, but what we're talking about here is the adequacy of the Court's on-the-record explanation, and that doesn't occur until after the arguments are made. Flores Mejia, I would submit, is directly appointed. Judge Jordan, you'll remember during the on-Bonk argument in Flores Mejia, you asked Mr. Zarosmer about 403 balancing. I did, indeed. Why is this different from 403 balancing? And it's not. I think you acknowledged that it's the same analysis here. Now, I see my time is up, but I really would like to spend just a couple of minutes talking about homelessness. Go ahead. Because I see that the Court is not accepting my argument about why Judge Irenas didn't abuse his discretion here. We're talking about a judge with very extensive experience handling these and other kinds of cases, so you have to find an abuse of discretion under 403. And I can submit here that although the video is shocking, it's not nearly as emotionally disturbing as other videos that this Court has agreed with. It was not a violation of 403. But with respect to harmlessness, the evidence here with respect to both the conspiracy and especially the conspiracy to traffic drugs really was overwhelming. Kareem Young was the icing on the cake. You had conversations. You had wiretapped conversations with each of these defendants, talking to Mikkel Derry about drug trafficking, with respect to Nacon and Bailey, warning Mr. Derry about where police surveillance was. With respect to Mr. Venable, you have Mr. Derry warning Mr. Venable about where police surveillance was. The argument that the defendants made was, sure, there's a drug trafficking conspiracy going on, but we're just mere buyers. Well, mere buyers don't act like that. Mere buyers don't act like Mr. Venable did when he took direction from Mr. Derry to go to the McDonald's restaurant and sell heroin at a specific time in a specific place. Mere buyers don't get information from the head of the drug trafficking organization, like Mr. Bailey got when Mr. Derry said to him, Leek Mills is getting out of prison and he's going to be strapped, and I'm going to make sure that he's got bread so that he can join this conspiracy. With Mr. Davis, I heard Ms. Capuano stand up here and said there was really nothing in the record other than Mr. Young's testimony that linked him to this conspiracy. The Tyquan James murder evidence, setting aside the video, was crucial to proving Mr. Davis' involvement in this conspiracy, because within hours of that murder, Mr. Davis is on the phone with Mikkel Derry telling him, we've got a hotel room for you and Malik, and I've got the keys right here. Now if that's not a member of a drug trafficking organization who's telling the leader of the organization that just committed a murder that they've made arrangements to hide him from the police, I don't know what else you need. And Davis is also seen on video outside of the trap house, standing next to another man who's got a gun visible, the police roll up, both of them run away, Davis chucks a gun, the gun is recovered by the police, and then two days later the leaders of the conspiracy are talking about the fact that Davis was arrested with a gun in front of the trap house. These guys were completely buried by the wiretap evidence in this case. But it just so happens that Mr. Young was able to also come in and add further elaboration, icing on the cake as I said, to explain that each of these defendants were not mere buyers. He said that Mr. Bailey was buying drugs from Mr. Derry for several years. He said he was armed while he was selling drugs in the village. With respect to Davis, he said, when we were selling heroin, Davis was standing right there with a gun. With respect to Mr. Venable, he said, Mr. Venable, I see him carrying around this very distinctive .22 caliber sawed-off rifle, which was seized from Mr. Venable when he was arrested, and then there was a .22 caliber shell found at the scene of one of the shootings. So you could take this. There are eight clocks on it. The cocaine. You've got a conspiracy charge in only the sale of heroin, yet evidence is coming in about somebody else who was arrested for possession, possession with intent, I think, given the quantity, of cocaine, before the time of the charged conspiracy, even though it says on or about. Why isn't that a problem? Well, it's not a problem because we're allowed to admit 404B evidence in order to show the defendant's mental state, which was Mr. Bailey put at issue squarely from the jump. In his opening statement, he says, my client wasn't arrested with a gun. They didn't find a gun when they searched my client's house. Now, there's conversations where Mr. Bailey's on the phone with Derry saying, you know, bring me the blick, or he's talking about a gun that he's gotten. But he's contesting throughout this trial that he would have any basis to know that guns were used in the course of this conspiracy. And one month before the start of this conspiracy was charged, he's in that neighborhood. He's in the very neighborhood where the heroin trafficking takes place with a gun selling cocaine. And he shows, and we scrupulously followed this court's requirements for 404B evidence. We gave notice. We set out the logical chain of inferences in our pretrial papers. We explained the probative value. And the judge gave a limiting instruction when the evidence was admitted, when the Bailey 404B evidence came in, in its final charge. And the prosecutor, during both his initial summation and his rebuttal summation, referenced that limiting purpose for which the Bailey 404B evidence came in to show that it was reasonably foreseeable to Bailey that his co-conspirators would use guns in the course of drug trafficking in this neighborhood. And that's why Judge Arenas did not abuse his substantial discretion in admitting the 404B evidence. And for the same reasons that I argue that the James evidence, if there was an error, and it sounds like the error would have been the admission of the video because the other evidence about the Taekwon James murder is relevant and probative for many reasons. It's the only discharge that is caught on the wiretap and, of course, it's caught on video. We had to prove a discharge. Otherwise we can't get them. Do we ever get to a point where harmless error becomes a license? Do we ever get to a point where we say, okay, it's error, but it's harmless error given all the other evidence, and we basically send a message to litigators that, well, these folks on the Third Circuit are probably going to have a problem with this, but it's going to be harmless, so we're going to get it in, and we're going to get the bang for the buck because we're going to get the armor we asked for, whatever. And maybe this is not the case to do it, but is there ever a couple of times where we need to say, this has just got to stop, this abuse has got to stop, and given the overall context that we can no longer find this error as harmless? Judge, just last week you reversed a conviction from my office, unfortunately. Was it Mr. Askin? No, it was not Mr. Askin. It was other prosecutors, but there was a finding of a Doyle violation, and we argued that the error was harmless, and this Court said it wasn't. But I would point out that in the Albert case, which involved a very, very graphic 45-minute video that was admitted to evidence showing excruciating wounds to the victim in that case, and that was showing the jury the crime that had been committed by the defendant, the torture that had been inflicted by the defendant. Remember here that this video, as disturbing as it is, does not implicate these defendants in murder. It was put in to show it was reasonably foreseeable to them, and it was in furtherance of the video, but it doesn't show that they committed the murder. But even in Albert, this Court said that even if the admission of that gruesome video was erroneous, that it was harmless because the evidence, the other evidence, was overwhelming, and I submit the other evidence here is so. I know you're, if we can hold you up for just another moment, but I am interested in the Chief's question to you about how we can appropriately get the message to the prosecutors in your office. I'll repeat, nothing in the substance or the tone of my questions, I hope, implies that I think there was ill motivation here.  But the concern is that a kind of aggressiveness about wanting to get just this extra piece in, you know, how do we get the message through that you should be tuned in to it, that you don't need to see the person shot dead. The jury doesn't need to gasp in order to make your point, and you really are creating an issue for appeal. I don't know how it gets any straighter than that than the district court judge saying, you're making an issue for appeal. How do we get the message to prosecutors? Think about that. We're not trying to, you know, that's your job. You're supervisors. You're very good at it. You've got high-quality professional folks. But how do we do it unless at some point we say, okay, we just can't deal with this as harmless error anymore. How do we send the message? Well, Your Honor, the message would clearly be sent if you write an opinion saying that this was an abuse, even of the district court judge's substantial discretion under 403. We've been doing that. We've been doing that. But Judge McKee, let me point out that in the Duca case, which I know I argued to you several years ago, we had very, I would submit, much more disturbing videos put into evidence, similar in some sense to the video here. I had a lot of problems with Duca. Your Honor, you did. You pressed me on that on that day. But at the end of the day, the court wrote an opinion that said the judge Kugler didn't abuse his discretion under Rule 403 in admitting that evidence, even though there was also testimony about the defendants watching these graphic beheading videos. These are the terrorists who ride in uniforms. Right. And, Your Honor, we looked at Duca when we were trying to figure out, you know, where's the line? Because the line here is, you know, can not necessarily be bright. The judge has to make a judgment call here. And when you're talking about balancing prejudicial effect versus probative value, that's a kind of a tough call for everybody to agree on. Hence the abuse of discretion standard. That's right. And, Your Honor, generally under 403, and this is a pure 403 argument. We had arguments in the brief that this was a 404B violation. But I think the court understands that this murder was absolutely intrinsic to this conspiracy. It was carried out because these defendants wanted to keep the competitors out of the village. But under a pure 403 balancing on which reasonable minds can differ, and it looks like members of this panel agree that if they had been the trial judge, they would have kept this out. We can bet on it. Yeah. I'm in. You can bet on that one. Yeah. But Judge Irenas was also a very experienced trial judge, and he was not cutting the government a ton of breaks in this case. If you look at the transcript, he took us to task on a number of instances. But he ruled, he made a call here, and he acknowledged it was a close call. That's what he meant when he said, you know, you're going to have an issue on appeal. But he also may have been saying, you really don't have any other issues on appeal because I've basically given you most of what you wanted. We understand you. Some of the defense attorneys' opponents deserve some time. I'm not sure. Yeah. Okay. Thank you. Thank you. Your Honor, this is the case. Your Honor asks, where is the case where you have to find that there wasn't harmless error? With regard to Mr. Macon, let's just look at the 924C evidence, because Mr. Macon is doing ten years of his 20-year sentence on the 924C. You had one statement from Kareem Young saying that Macon was out there one day and asked him if he was strapped. No witness ever said that they saw Macon with a gun, much less discharge a gun. Two of his residences were searched. No gun. They made a big deal about all the videos and the trap houses that showed all the guns. We saw. Okay. Well, let's get off sufficiency of the evidence and get you to rebut Mr. Gross on the point on which most of the argument has been had here. And he has made the point, if I understood him right, that this case is really just like Flores Mejia, and it was on you guys to stand up and say, hey, Judge, you haven't done an adequate balancing. Is he right or is he wrong? And if he's wrong, why is he wrong? He's wrong, Your Honor. We argued that we filed briefs at the beginning of the case. We then argued it on December 2nd, and then we argued it again on the day that the video came in, as Your Honor quoted, in my exchange with Mr. Askin and Judge Arenas. We said to him, I mean, maybe we didn't say the magic words, you did not do a proper balancing test, but when he said to me, why don't you let it in and you'll have an issue, I said, I don't want it in. I was saying to him, you didn't do the balancing test, or the balancing test is wrong, Your Honor. I was saying it to him. This isn't like the type of case where you have to have this talismanic statement, oh, you did not do the balancing test. We said that to him. We argued it three separate times. We clearly, clearly said to him that it was overly prejudicial, that it was substantially prejudicial and it substantially outweighed the probative value. So I respectfully disagree with Mr. Goers. I don't think there was much else that we could have done other than that. The only thing that changed is whether or not it's intrinsic or extrinsic evidence. It's a matter of that whole talk. I used to have in my memory here a court in Tulsa, but I assume it was mostly you having that exchange with the government, with the judge. And a lot of it looks like it's just, is it intrinsic if it is 404B, you forget about, is it extrinsic so you have to deal with 404B and 404B? Your Honor, I don't think it was intrinsic. I really don't. I'm not saying it was, but I'm saying that was the nature of a lot of that discussion. Right. And the other nature, again, to rebut something that Mr. Goers said, he said, oh, we needed this to show the identity of the person that killed Mr. James and, you know, the defense wouldn't stipulate to that. They had the identity. They had all those, for the three hours on December 2nd where, you know, the Darries are talking about the murder basically right before it happens, right after it happens, Kim Spellman, McCall Darries' girlfriend, says, you know, Malik headshot, first homicide of the year, he doesn't need to go to a shooting range. The identity, the jury knew, the jury knew who, and why would we have not, we were never asked to stipulate to the identity. If you look at that exchange, the exchange there was Mr. Askin saying, this goes to Pinkerton, Your Honor. He wasn't saying this goes to the identity. That's something that they came up with on appeal. Well, there was some comment, wasn't there, about, oh, you need to see the bike because the bike ties it in somehow. Wasn't there at least expressed some idea about you needed this for an identification tie-in? Yes, Mr. That's true. Mr. Danilowitz did say, oh, yeah, yeah, it's the bike as well. And I would suggest that's because they knew. They proffered a reason, right? Right. But, Your Honor, it was not a legitimate reason because there was all of this evidence that already showed everybody in that courtroom, the jury as well, knew that it was Malik Derry who had killed him. It was also crystal clear that our clients, that the government wasn't saying that our clients killed the guy, so why would we have not stipulated? I would have stipulated to it. I was never asked to stipulate to it because that wasn't the issue that was going on at that sidebar. And the last point I'm going to make, Your Honor, going to your point about when is it time to send the message, when is it time, in DUCA, this was the office that did the DUCA case and there's one significant difference between DUCA and here. In that case, I think in your own language it said they sanitized the video. That is, they took out the, you know, cutting off of the heads and they had an agent then narrate what was happening. I didn't see those videos, but I'm assuming what they were talking about is when they got to the point, to the gruesome point of the heads coming off, they didn't show that and an agent actually, what I read from the opinion is that an agent then narrated. They could have done that in this case and that would have taken a huge amount of the, you know, audible gasp aspect of it away. They could have just simply said, oh, yes, ladies and gentlemen, remember all those texts and emails that we played you showing that Malik Derry killed Ty Quinn James? We have a video, we'll show you the bike leading up, but then when you get to the real horrific part of it, and I don't concede that it's not graphic, the horrific part of it was the guy dropping the gun and then the guy dropping, they could have just narrated that like they did in DUCA. Even after DUCA, they decide to gild the lily and send it out in the package by showing the actual horrific part of it, which was to get the audible gasp and they got it. Thank you. Thank you.